Thomas E. STARKS and Herman C. Price, Appellants,

v.

VILLAGE GREEN APARTMENTS, Appellee.

No. 82A01–0510–CV–461.

Court of Appeals of Indiana.

Sept. 28, 2006.

**412**

---

Robert R. Faulkner, Evansville, IN, Attorney for Appellants.

Robert P. Carithers, Evansville, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Thomas E. Starks and Herman C. Price (Lessees) appeal a grant of summary judgment in favor of Village Green Apartments (Village Green) and the denial of their cross-motion for summary judgment in Village Green's lawsuit to recover damages stemming from the breach of an apartment lease. Lessees present the following restated issues for review:

1. Did the trial court err in basing its ruling on briefs submitted by Village Green that had been stricken pursuant to Lessees' motion?

2. Did the trial court err in granting Village Green's motion for summary judgment and in denying Lessees' cross-motion for summary judgment?

We reverse and remand with instructions.

The facts favorable to the nonmoving party are that Thomas D. Starks and Jeremy C. Price (hereinafter collectively referred to as "the sons") were going to attend college in Evansville, Indiana in the 1998–99 school year. Their fathers, the appellants in this action, rented an apartment for them at the Village Green Apartments. The lease was signed by Lessees and their sons on June 6, 1998. It is a uniform Village Green Apartments lease agreement, appearing on Village Green Apartments stationary. It states, in pertinent part:

RESIDENTIAL LEASE

This lease is entered into on June 4, 1998, by and between

THOMAS E. STARKS    HERMAN CURTIS PRICE

as Resident(s), and Village Green Apartments, as Lessor, on the apartment located at

18–2612   EFFINGHAM DR.

Evansville, Indiana 47715

Resident(s) covenant and agree that, unless an additional child be born to Resident(s) during tenancy, only the following persons will occupy the premises in addition to the Resident(s) listed above:

THOMAS D. STARKS    JEREMY C. PRICE

The initial term of this lease shall commence on June 6, 1998 and end on June 30, 1999.

*Appellant's Appendix* at 10. Thomas E. Starks and Henry Curtis Price placed their initials above the dates listed with respect to the duration of the lease. The lease called for a security deposit of $300, a first month's rent of $412, and $494 monthly rent for the remainder of the lease period. In conjunction with the lease application, Lessees completed a form, expressly "considered part of the lease agreement," *id.* at 21, that listed their current addresses. Lessees also signed, on June 6, 1998, a "Cablevision Addendum" whereby they agreed to pay $20 for the first month's cable television bill, and $24 per month for cable television thereafter. Those fees were included in the total rent listed above.

The sons apparently occupied the apartment for a short time, but vacated sometime in August 1998 and apparently returned to their fathers' respective houses. Rent on the apartment was paid through September 1998, but not thereafter. In October 1998, the sons both returned to Evansville and saw what they interpreted as indications the apartment was occupied by someone else.

On October 22, 1998, Village Green sent a security deposit notice addressed to "Thomas Starks" to the address of the rental unit Lessees had rented. *Id.* In it, Village Green claimed Lessees had breached the lease and therefore owed $4320.50 in damages, including $4230 in unpaid rent for the balance of the lease period, $300 in "forfeit deposit—skip", and a total of $90.50 to replace the locks, clean the tub and kitchen, and replace the drip pan. *Id.* Village Green evidently turned the matter over for collection and on January 4, 1999, an Evansville law firm sent a letter to "Thomas E Starks" at the Effingham Drive address. *Id.* at 38. An identical collection letter was sent to "Herman Curtis Price" at the Effingham Drive address. Notwithstanding the fact that Lessees did not live at the apartment, they somehow received word of the collection action. On January 15, 1999, they sent a joint response to the collection firm disputing Village Green's claim, in part upon the claim that the apartment had been rented to someone else since October 1998. The collection firm responded that the apartment in fact had not been re-rented. So far as we can tell from the record, little else of consequence happened in the matter for more than four years.

On March 10, 2004, Village Green filed a lawsuit against Lessees, seeking recovery of the amount set forth in the October 22, 1998 security deposit notice ($4230.50), plus attorney fees. Lessees answered in denial on May 14, 2004, asserting the affirmative defenses of failure to state a claim upon which relief can be granted, laches, failure to mitigate damages, and failure to comply with Ind.Code Ann. § 32–31–3–14 (West, PREMISE through 2005 1st Regular Sess.). On April 7, 2005, Village Green filed a motion for summary judgment. Lessees filed a response in opposition to that motion and also filed a cross-motion for summary judgment. The trial court scheduled a hearing on those motions, first for June 27 and then for August 16, 2005. Those hearings were continued. On August 29, 2005, Village Green filed its response to Lessees' cross-motion for summary judgment. On August 31, 2005, the trial court conducted a hearing on Village Green's motion for summary judgment, and on Lessees' cross-motion for summary judgment. At that hearing, the parties submitted several oral motions. Lessees asked the court to strike Village Green's response to their cross-motion for summary judgment on grounds that the response was not timely filed. The trial court granted that motion. At the same hearing, Village Green orally moved to strike both Lessees' response to Village Green's motion for summary judgment and Lessees' cross-motion for summary judgment. The trial court denied those motions. Finally, Village Green orally moved to strike certain affidavits filed by Lessees in support of their cross-motion for summary judgment. The trial court granted that motion.

On August 31, 2005, the trial court granted Village Green's motion for summary judgment and denied Lessees' cross-motion for summary judgment.

1.

■ We note at the outset that Lessees challenge the ruling in favor of Village Green upon grounds that the trial court erroneously considered, and even partially

incorporated into its ruling, Village Green's stricken briefs. The striking of the briefs, according to this argument, left Lessees' cross-motion for summary judgment effectively unopposed. They explain:

> Where a party failed to respond to the opposing party's motion or otherwise properly object to affidavits any error is waived, *Benchmark* [sic] *of Florida Inc. v. Star Financial Card Services, Inc.*, 679 N.E.2d 973, 980 (Ind.Ct.App.1997). That being the case this Court's holding in [*Desai v. Croy*, 805 N.E.2d 844, 850 (Ind.Ct.App.2004), *trans. denied* ] is utterly meaningless if, as occurred here, it is so easily circumvented by making additional untimely objections at the hearing. The Trial court by granting Starks and Price's motion to strike with a wink showed absolutely no regard to this court's holding in the *Desai* case as adopted by the Indiana Supreme Court in [*Borsuk v. Town of St. John*, 820 N.E.2d 118 (Ind.2005) ], both of which are cited above. Starks and Price would urge that this Court meant what it said when it held that where the opposing party fails to timely respond to a motion for summary judgment the court should treat the motion as if it is unopposed, *Desai*, 805 N.E.2d at 851.

*Brief of Appellants* at 8. As we understand it, the gist of Lessees' argument is that because Village Green's brief in opposition to Lessees' cross-motion for summary judgment was properly stricken as untimely, the court was compelled to grant Lessees' cross-motion because it stood unopposed. This view overstates the effect of the striking of Village Green's motion in opposition.

We note first that the primary authority cited by Lessees in support of this argument, *Desai v. Croy*, was a medical malpractice action, which has its own unique guidelines. One of those guidelines is that a plaintiff alleging medical malpractice must demonstrate that the defendant, who owed a duty to the plaintiff, violated a standard of reasonable care, thereby causing injury to the plaintiff. *Desai v. Croy*, 805 N.E.2d 844. Also, because of the complicated nature of medical diagnosis and treatment, expert testimony is, as a general rule, required to establish the applicable standard of care. *Id.* "If medical expert opinion is not in conflict with respect to whether the physician's conduct met the requisite standard of care, there are no genuine triable issues", and therefore summary judgment would be appropriate. *Id.* at 850. It is with these principles in mind that *Desai* is to be understood.

In *Desai*, we determined that the trial court erred in permitting the plaintiff to file a belated response to the physician/defendant's motion for summary judgment. The physician's motion for summary judgment included the medical review panel's opinion that the physician had not breached the applicable standard of care. Having stricken the patient/plaintiff's materials in opposition to the physician's motion, the physician's motion stood unopposed. More to the point, his expert evidence that he had not breached the applicable standard of care stood unopposed. Thus, in view of a plaintiff's particular burden in a medical malpractice case, the striking of the patient's materials in opposition led inevitably to a granting of the physician's summary judgment motion. This should not be interpreted to mean, however, that in every case where a nonmovant's response to summary judgment has been stricken, or indeed one was never filed in the first place, the movant is therefore entitled to summary judgment. This court did not even go that far in *Desai*. (*E.g.*, "[i]n other words, we must treat Dr. Desai's motion as if it were unopposed, and *if appropriate*, we must enter summary judgment in his favor." *Id.* at 851 (empha-

sis supplied).) Rather, a motion for summary judgment that is unopposed should be granted only if the designated materials, regardless of whether they stand unopposed by materials designated by the nonmovant, warrant it.

In a technical sense, after the trial court struck Village Green's motion in opposition, Lessees' cross-motion for summary judgment was not opposed. We say "in a technical sense" because Village Green's motion for summary judgment remained properly before the court. The two motions for summary judgment were mutually exclusive—the granting of one compelled the court to deny the other. Be that as it may, even if we assume Lessees' cross-motion was left unopposed, such did not compel the court to grant Lessees' motion on that basis. The court was free to grant the motion or deny it, as the merits dictated. As it turned out, the court denied Lessees' cross-motion, and granted Village Green's, upon a rationale set out in Village Green's stricken brief. If the trial court was persuaded that such rationale was correct, as the court obviously was, it was not foreclosed from adopting the rationale merely because Village Green advanced it in the stricken brief. All of that to say this: We are not inclined to resolve this matter on procedural grounds. The trial court correctly granted Lessees' motion to strike, but was free to make a ruling supported by the law and the materials properly before it, regardless whether that ruling included rationale consistent with arguments made by Village Green in stricken material. Accordingly, we proceed to the merits of the ruling in favor of Village Green.

### 2.

Lessees contend the trial court erred in denying their cross-motion for summary judgment, and necessarily therefore, also erred in granting Village Green's motion for summary judgment. As indicated above, those rulings represent two sides of the same coin. At issue is not only ownership of Lessees' security deposit, but also liability for damages allegedly flowing from Lessees' breach of the lease agreement.

We review the grant or denial of a motion for summary judgment using the same standard employed by the trial court. *Forty–One Assocs., LLC v. Bluefield Assocs., L.P.*, 809 N.E.2d 422 (Ind.Ct.App. 2004), *trans. denied.* Summary judgment is appropriate only when the designated evidence demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* We construe the designated evidence liberally in a light most favorable to the non-moving party, and will affirm if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. *Id.* The party appealing from a summary judgment decision bears the burden of persuading the appellate court that the grant or denial of summary judgment was erroneous. *Simon Prop. Group, L.P. v. Acton Enter., Inc.*, 827 N.E.2d 1235 (Ind.Ct.App.2005), *trans. denied.* "If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper." *Id.* at 1240.

■ The subject of apartment damage deposits is governed by statute. I.C. § 32–31–3–12 (West, PREMISE through 2005 1st Regular Sess.) provides that a landlord may retain a security deposit upon the termination of a tenant's occupancy for the following reasons: "(1) [T]he payment of accrued rent; (2) the amount of damages that the landlord has suffered or will reasonably suffer by reason of the tenant's noncompliance with law or the rental agreement; and (3) unpaid utility or sewer charges that the tenant is obligated

to pay under the rental agreement[.]" I.C. § 32–31–3–14, however, provides that in order to retain a security deposit, the landlord must, not more than forty-five days after the tenant terminates occupancy, mail to the tenant an itemized list of damages claimed for which the security deposit may be used. That list must set forth the estimated cost of repair for each damaged item, as well as the amounts and the lease on which the landlord intends to assess the tenant. *Robinson v. Gazvoda,* 783 N.E.2d 1245 (Ind.Ct.App.2003), *trans. denied.* A tenant is entitled to return of the deposit if he or she supplied the landlord with a forwarding address, but the landlord failed to provide an itemized list of expenses for damage. *Id.*

Lessees contend Village Green did not comply with the above-referenced notification requirement because it did not mail to them, within forty-five days of the termination of occupancy, an itemized list of damages for which Village Green intended to keep the security deposit. Village Green notes that its duty to provide an itemized list is not triggered until the tenant has provided it with a forwarding address to which the itemized list may be sent. *See Lae v. Householder,* 789 N.E.2d 481 (Ind.2003). Village Green claims the physical occupants of the apartment—Thomas D. Starks and Jeremy Price—did not leave a forwarding address. Lessees respond that they—Herman Curtis Price and Thomas E. Starks—were also tenants under the lease and Village Green had *their* forwarding addresses from the beginning. The trial court considered and rejected Lessees' argument in this respect, holding, "The Defendants were not 'tenants' under the Return of Security Deposit Statute of Ind.Code 32–31–3–12, since the term 'tenant', is defined by Ind.Code 32–31–3–10 as 'an individual who occupies a rental unit ...'". *Appellant's Appendix* at 7. In essence, the trial court ruled that because the fathers did not physically move into the apartment they had rented with and for their sons, they were not "tenants," and therefore it did not matter that Village Green knew their (the fathers') addresses, as theirs were not *the tenants'* forwarding addresses. We conclude this interpretation is too restrictive.

I.C. § 32–31–3–10 does indeed define "tenant" as an individual who occupies a rental unit: "(1) for residential purposes; (2) with the landlord's consent; and (3) for consideration that is agreed upon by both parties." The question in this case is, what does it mean "to occupy" a rental unit? The trial court obviously concluded that "to occupy" means to live in, in a literal, physical sense. To be sure, that is one meaning of the term. Another, however, is "to take or hold possession or control of". *Merriam–Webster Online Dictionary* (found at http://www.m-w.com/dictionary/occupy).

A lease agreement imposes certain duties, rights, and obligations with respect to the leased premises. *See Hendrickson v. Alcoa Fuels, Inc.,* 735 N.E.2d 804 (Ind. Ct.App.2000). The lease in the instant case explicitly conferred upon Thomas E. Starks and Herman Curtis Price the right to "occupy and use" the apartment for residential purposes. *Appellant's Appendix* at 10. Clearly, they had bargained and paid for the right to live in the apartment themselves. That they chose not to physically reside there does not change the fact that they had *the right* to do so. We note in this regard that although they functioned in essence as guarantors in this situation, the parents were more than that under the terms of the lease. That is, both fathers were listed as "residents" on the face of the lease. *Id.* The lease specified that their sons would "occupy the premises *in addition to the Resident* (s) listed above[.]" *Id.* (emphasis supplied).

In view of these aspects of the lease, the parents' status as "residents" was not altered by the fact that their sons resided in the apartment, but they did not. On these facts, we are not inclined to view "residents" as a descriptive term, but instead as one designating status. Similarly, "occupy" in this context does not require actual, physical presence, but instead connotes the legal right to maintain actual, physical presence. The fathers and their sons alike were all "residents" of the apartment, in that they had contracted and paid for the right to live there. If some, all, or none of them had exercised their right to physically reside in the apartment during the lease term, it would not alter the fact that, by the terms of the lease, all were residents. Thus, we conclude, they were all tenants as well.

■ We will now evaluate the parties' claims concerning Village Green's compliance with the security deposit statutes in light of our determination that Lessees were "tenants" within the meaning of I.C. § 32–31–3–12. In order to retain all or part of the security deposit as damages, Village Green was required to send notice to Lessees within forty-five days after the apartment was vacated. Village Green was aware by at least October 28, 1998, that the apartment had been vacated. This may be deduced from the fact that, on that date, Village Green sent a security deposit notice to "Thomas Starks" at the apartment address demanding, among other things, all of the rent due for the remainder of the lease, listing "skip" as the reason. *Id.* at 37. Thus, at the latest, Village Green had forty-five days after that, or until December 12, to send to Lessees an itemized list of damages for which Village Green intended to keep the security deposit.

Notice did not reach the two fathers until January 1999. Village Green claims it had not been provided with a forwarding address, but this argument is largely premised upon the claim that the fathers were not "tenants" and that Village Green needed the sons' forwarding addresses. Having concluded that the fathers were also tenants, it follows that their forwarding addresses would suffice. In the process of completing the application to rent the apartment, both Thomas E. Starks and Herman Curtis Price completed a form that listed each of their current and former addresses, and their current and former places of employment. That form remained in Village Green's possession at all times relevant to this appeal. So far as we can tell, the men still live at those addresses, and certainly did when the collection firm first contacted them, in January 1999, about the amount Village Green claimed Lessees owed for breaching the apartment lease. Moreover, we note that Village Green did not provide Lessees, at their respective addresses, with an itemized list of damages claimed for which the security deposit may be used until March 11, 1999. That was long after the forty-five-day period had expired even under the most generous (from Village Green's perspective) calculation of when the forty-five day period commenced to run. As a result, Village Green did not comply with the provisions of I.C. § 32–31–3–14. We now examine the consequences of that noncompliance.

■ "The failure to comply with the notice of damages requirement constitutes an agreement by the landlord that no damages are due." *Mileusnich v. Novogroder Co., Inc.,* 643 N.E.2d 937, 941 (Ind.Ct.App. 1994). As a result, the tenant is entitled to return of the entire security deposit and reasonable attorney fees, which must be determined upon remand. *Mileusnich v. Novogroder Co., Inc.,* 643 N.E.2d 937. Moreover, a landlord must comply with the

statutory notice requirement in order to preserve its right to recover the other damages to which it is entitled. *Durf v. Molter,* 839 N.E.2d 1208 (Ind.Ct.App. 2005). As we have explained, "[t]he matter of the security deposit refund, if any, should be resolved first, and is a prerequisite for pursuing claims for other damages in excess of the security deposit, or not addressed in Ind.Code § 32–31–3–13. If the required notice is not given, the landlord has implicitly agreed that there are no other damages to collect." *Id.* at 1211. As a result, Village Green not only must return Lessees' security deposit in full, but it is also foreclosed from recovering unpaid rent.

Judgment reversed and remanded for proceedings consistent with this opinion.

MAY, J., concurs.

CRONE, J., dissenting as to Issue 2 with separate opinion.

CRONE, Judge, dissenting as to Issue 2.

I agree with the majority's conclusion that Village Green must return Lessees' security deposit because of Village Green's failure to comply with the notice provisions of Indiana Code Section 32–31–3–14. Based on my reading of Indiana Code Sections 32–31–3–12 through –15, however, I must respectfully disagree with the majority's conclusion that Village Green is also foreclosed from recovering unpaid rent from Lessees.

Indiana Code Section 32–31–3–12 states in pertinent part,

(a) Upon termination of a rental agreement, a landlord shall return to the tenant the security deposit minus any amount applied to:

(1) the payment of accrued rent;

(2) the amount of damages that the landlord has suffered or will reason-

ably suffer by reason of the tenant's noncompliance with law or the rental agreement; and

(3) unpaid utility or sewer charges that the tenant is obligated to pay under the rental agreement;

all as itemized by the landlord with the amount due in a written notice that is delivered to the tenant not more than forty-five (45) days after termination of the rental agreement and delivery of possession. The landlord is not liable under this chapter until the tenant supplies the landlord in writing with a mailing address to which to deliver the notice and amount prescribed by this subsection. Unless otherwise agreed, a tenant is not entitled to apply a security deposit to rent.

(b) If a landlord fails to comply with subsection (a), a tenant may recover all of the security deposit due the tenant and reasonable attorney's fees.

(c) *This section does not preclude the landlord or tenant from recovering other damages to which either is entitled.*

(Emphasis added.)

The majority's conclusion renders Indiana Code Section 32–31–3–12(c) meaningless and creates a manifestly unreasonable result. I do not believe that a landlord's failure to give a tenant proper notice of damages for which a security deposit may be used precludes the landlord from recovering unpaid rent in excess of the amount of the security deposit. *See Schoknecht v. Hasemeier,* 735 N.E.2d 299, 303 (Ind.Ct.App.2000) (noting that Ind. Code § 32–31–3–12 " 'applies only to security deposits' and that the statute 'clearly and unambiguously preserves the right of the landlord . . . to recover other damages to which [he or she] is entitled.' ") (quoting *Miller v. Geels,* 643 N.E.2d 922, 927 (Ind.

Ct.App.1994), *trans. denied* (1995)) (alterations in *Schoknecht* ).

Accordingly, I dissent.